Before we begin, there are two preliminary matters. First, there is the matter of welcoming most warmly one of the most distinguished district court judges in the country, Judge Jan Du Bois. We are honored to have him helping us out, setting us straight, and he is probably as hard-working as they come. So we need all the help we can get. The workload is relentless and we're down two judges and have been for years. So we're most appreciative of having anyone help us, but to have someone as excellent as Judge Du Bois just makes us very, very happy and we welcome you most warmly. Thank you very much for those kind words. The second preliminary matter are two motions before the court. The first is made by Judge Smith. Thank you, Judge Berry, and I too want to thank my good friend and longtime colleague, Judge Du Bois, for joining us and for agreeing to help us. I cannot help but observe, however, that I think in the invitation to sit with us, the Chief did not include setting us straight as one of the objectives of the sitting, and that perhaps would have caused him to say no if it had been expressed. But he knew Judge Du Bois could help me lift 29,000 pages in one of the cases. Should we thank the lawyers in that case for providing us that opportunity? We should, yes. We'll have our opportunity. Our law clerks want to see the lawyers who created this record. I'm sure they're focusing on you now. Well, I would like to call forward one of my current law clerks, Mark Ciperi, for purposes of being admitted as a member of the Board of this Court. Mark? Mark has served with my chamber since December. He was willing to leave his place at Covington in D.C. to come and rescue us at a time of need when we had lost a law clerk in Midstream. I'm enormously grateful for that. I also cannot help but mention, and I hope he will not be embarrassed, that he is fairly recently engaged to one of my former clerks. And so it becomes something of an extended family by virtue of that wedding which is forthcoming, I believe, in September. So, sorry Marie couldn't be here, but I'm sure that she's delighted that you are here and being sworn into this court, which she served several years ago. So, I am very pleased to move Mark's admission to the Bar of the Third Circuit, Judge Beck. Do you have any objection to the motion being granted, Judge DuBois? Maybe I ought to refer to my law clerks. The answer is no, absolutely no objection. Nor do I. The motion is granted. And I have one of my own. Could my four law clerks come forward? I'm going to move the admission of my four law clerks. M. Patrick Moore, A. Paul Pinot, Catherine Weiss, and David Feeder. It is with great pride that I do so. I've been on the federal bench for 25 years and I've had superb law clerks. I see one of them in the audience here. This is as good a group as I've ever had and I'm just so happy to see that they want to continue their interest in the Third Circuit after this year by being admitted to the court. Each of them served a clerkship before they came to me, three federal and one state. And they make their schools and their former judges very proud. Dave's from Fordham Law School, Katie and Pat, Boston College School of Law, and Paul from Harvard. So I'm very, very happy to move their admission. Anyone who's been around us long enough knows in the words of the old song, without our law clerks we are nothing. Is my motion going to be granted, Judge Smith? You're in the middle, Chair, and I'm not inclined to object. In fact, I want to thank your clerks for their help and hospitality this week. They've been enormously helpful. It is also evident to an outsider that there's a great chemistry to this crew. You're very fortunate to have them and they to have you. I have no objection and I want to add my thanks to the law clerk who answered the phone when I was hopelessly lost in Newark this morning. The motion is granted. Will the clerk please administer the oath and may Judge Smith's law clerk come down as well. Thank you, Mr. President. Do you solemnly swear or affirm that you will demean yourself as an attorney to the counsel of this court, uprightly and according to the law, and that you will support the Constitution of the United States of America? I do. Congratulations. Welcome to the bar of the Third Circuit and much good luck and happiness to you all always. That was the easiest part of what we're going to do today, isn't it? We will hear argument now in the United States v. Harris. Good morning and may the police be at court. My name is Edward Gordon. I represent the appellant in this matter, W. Oscar Harris. I ask that the courts leave to reserve three minutes for rebuttal. Granted. You were appointed under the CJA in this case, were you not? That's correct, Your Honor. Probably one of the more unusual cases you've received the appointment in. It certainly is and I've, as the court I'm sure has seen from the record, I've represented Mr. Harris since the day of his indictment. So I'm familiar with the proceedings throughout. Yes, well we thank you for your service. Thank you. Unlike most areas of law where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the controversious conduct. And it is still worse for that person to conduct the adjudication without affording the protection usually given on criminal trial. Those, of course, are quotations from the majority opinion in Bagwell and from Justice Scalia's concurring opinion in Bagwell. And I think that, I suggest to the court that both prongs of the argument that I make on behalf of Mr. Harris are driven by the concerns expressed in those two portions of Bagwell. For it is not that the district court would have been left without a remedy to address the conduct that was very troublesome here other than civil contempt. You're not suggesting he was, did not have the power or the authority or that indeed civil contempt was inappropriately found here. Well, I think that becomes very interesting as to whether or not what actually occurred here was appropriately civil contempt. I see the issue here is whether the error was in vacating the civil contempt as opposed to imposing it in the first instance. That is certainly the order appealed from. But at some point, the basis upon which the civil contempt was originally imposed may very well have dissipated. At some point in time through this continuum, this civil versus criminal, this contempt matter is transformed. I mean, I don't want to sound metaphysical, but that is at the heart of your argument, isn't it? Yes. And I find it interesting that you began your argument with an invocation of the language from Bagwell and a reference to Justice, then Judge Alito's opinion in Chadwick. Because Chadwick, we can, I suppose, argue over whether it relies, whether it simply quotes, invokes, or whatever. But for my part, it seems to me that a significant part of the reasoning of Chadwick was reliance upon Bagwell's emphasis on indefinite, the indefinite nature of confinement. Would you agree? Certainly so, and I agree that we can argue about that. What weight should we give that? What import should we give that? Isn't that of enormous import as the closest case on point within the Third Circuit as to whether or not we can have permissibly here an indefinite period of confinement pursuant to an adjudication of civil contempt? There is certainly instruction in Bagwell about, excuse me, instruction in Chadwick about what we can or might do here. But respectfully, I think Chadwick, for any number of reasons, is an entirely different case. For instance, Chadwick is, as the language in Bagwell suggests, the paradigmatic civil contempt case where the order is to do something affirmative. Where in this case... Isn't this also, cannot one say this is the same thing? I order you to do something affirmative, and that's to stop filing liens against federal judges, prosecutors, everybody who walks the earth. Stop, just stop. Well, of course, that's the interesting discussion in the United Mine Workers case, the earlier United Mine Workers case, where the court points out that one can phrase a civil contempt citation as either stop, continue to work, or stop striking. And that's what we have here. Depending upon how one looks at this, I suggest to the court that this is really a prohibitive injunction, that is, stop doing something. Rather than the mandatory. The main distinction, in my view, and you're quite right, Chadwick is different in this respect, at least. That was decided under the habeas standard of review. Certainly. But there is powerful dicta in that case, and powerful dicta in Bagwell. Is there not? Yes, but I suggest that the powerful dicta in Bagwell suggests that certainly Judge Scalia, if faced with this situation, would have said that the requirements of due process in a normal criminal trial would apply. And I suggest to you that the reasoning in Bagwell, even in the majority opinion, would say that the requirements of the criminal contempt proceeding would apply. In Bagwell, that was, in the end, the final decision. You made reference a few moments ago to the paradigmatic contempt case, and following up on Judge Barry's question. Isn't Chadwick, or rather, isn't this case closer to Chadwick, for example, than all those cases that arise out of the recalcitrant witness context, where you have a grand jury with a definite life to it? Respectfully, I think not. Because I think what we are really doing in this case is punishing prior conduct, when you look at it. If you just look at the sequence, for instance, of what occurred. Are we punishing it, or is he punishing himself by continuing to engage in this conduct? Well, respectfully, I think that is a different issue, because he's certainly not punishing himself for prior conduct. He would be out of this contempt citation in a heartbeat if he stopped filing these liens. Absolutely. By the way, parenthetically, it's not an unimportant question. Has he stopped, or is he still filing them? Fair question. I was going to ask the government, but I can't wait for the answer. One that the United States attorney and I both anticipated. We were in contact with the district court, and it does continue. I was on the panel that affirmed his conviction. Has a gleam been filed against me yet? No, I'm serious. I'd like to know. Maybe you'll want to sell my house. That very fact, I think, does point out that we are no longer protecting any victim. But how can you say he's being punished by the order of the district court, when he continues to do this and he could stop like that? The point I was making is that, as in the normal criminal contempt situation, what I think really occurred here is punishment of prior conduct. Because every time there's a hearing, what the district judge does is to affirm. Not initially, but eventually. But eventually, at some point. Every time he files a lien, it's new conduct. It is new conduct, which is sanctionable in a criminal proceeding. And now there's even a statute, as the district judge points out. There's a statute that could be used to punish him. Are you recommending – I know, this is a kind of stinky question. You're not recommending your client be indicted or held in criminal contempt. I'm certainly recommending that he be afforded the rights that he would get in such a proceeding. So then he'd come in and he'd have a nice jury trial and we can hear about how we have all these straw men. Every citizen of the United States has a straw count in the Treasury Department or whatever it is. I understand that the facts here present a very difficult situation. On those facts, and I want you to clarify something for me because I'm actually not sure I remember it correctly. You're a long history with this case, I'm sure you do. Is it a fact that Judge Simandl actually made the conditions more lenient along the way? Initially, it was a requirement that he sign some kind of certification that he would not file. But he was relieved of that and Judge Simandl only asked that he forego continuous fine. He did that orally. The judge did that orally. I personally have no doubt that, for instance, if the defendant – He did that at one of the hearings. He did. He did. But if the defendant had stopped at some point and we had a three- or four-month hiatus, I'm quite confident that Judge Simandl would have taken that opportunity to end it. But just the sequence, I think, just to go to your point, Judge Simandl. The initial order is in 2003. April 22, 2004, there's an order finding the defendant in contempt for past actions and saying you are prohibited from doing them in the future. June 9, then, there's an order that commences the contempt citation as of April 27 without additional evidence showing that anything happened between April 27 and June 9. So what's really happening functionally is the imposition of an indefinite term of confinement for past actions. And there, I think, is when the civil contempt morphs, if you will, into what is functionally criminal contempt. It would be an interesting issue whether the clock starts running each time he files a new lien. Go ahead, please. Mr. Borden, as I read your brief, you focused on ending the civil contempt sanction because the underlying proceeding ended. That is certainly one reason, but I think the reason – I'm sorry. And you didn't argue, as you're arguing now, that the proper vehicle for what Judge Simandl did was not civil contempt but, indeed, criminal contempt. And you also argued in your briefs that the due process clause required – well, it isn't a due process argument. The argument is whether the contempt nor should remain in civil contempt as long as he is able, has the ability to purge the contempt as opposed to the question whether further confinement will coerce compliance. I haven't heard anything on those arguments. Are you submitting those on the briefs? Yes. Well, no, sir. My argument there, obviously, is that the due process clause of the Fifth Amendment allows the court system to deprive a defendant of normal rights that would apply in a criminal contempt case when the contempt is suffered as a result of a coercive order. But when the rational basis for that coercive order ends, that is when there is no real expectation that it will ever be complied with based on this law. So that is the test for the morphing that you referred to a little bit ago. How would we craft this as a test, as a morphing test? Believe me, I certainly understand that there are difficulties inherent in such a test. We have, of course, this fascinating situation where we have Judge Alito's opinion on the Third Circuit and we have Judge Sotomayor's concurring opinion in Armstrong. She purports to set out a test, which the majority opinion very strongly rejects. Absolutely. Absolutely. But hasn't this circuit adopted a test in Braun that comes close to what you're arguing for? Well, we have not mentioned Braun. Well, you're out of time. I'll let you go a couple of more minutes. We'll get you on rebuttal, of course. But mention Braun. Yes, ma'am. Braun certainly is in direct conflict, and Judge Alito says as much in a footnote. Well, it was a recalcitrant witness case. It was, but the rational basis of Braun really has nothing to do, I suggest, with the recalcitrant witness statute. In the end, the Braun court sort of, I think, punts to the recalcitrant witness statute. Well, except that Braun preceded Bagwell and preceded Chadwick. Certainly. And the Chadwick opinion relies heavily on Bagwell. But respectfully, I think that the only learning that comes out of Bagwell that the court could rely upon in Chadwick was that one paragraph with the word indefinitely in it. And I understand it was in there, but that's really not what drives the Bagwell opinion. The Bagwell opinion is really a discussion of the difference between civil and criminal contempt. You were saying a moment ago that there's really no hope he'll comply with this order, and therefore it shouldn't continue. You don't say he's unable to comply, because that's where the court's very concerned, in bringing civil contempt to an end when someone's unable to comply with the order of the court. But the other half of it, when we know the order is not going to be complied with, that's a dangling something, which we don't really know here, in my view. Don't you bump right into Judge Simandl's language. He said, Harris has not demonstrated he has no intention of complying with this court's order. It would be a bizarre result, however, to dissolve a lawful order of this court merely because the contemnor persists in violating it. That's what you've got here, through his continuing affirmative acts. That's what you've got here. And that's why all of these are such difficult cases. That's why Chadwick's a difficult case. Well, sure. But following up on Judge Barry's question, isn't that precisely why, that even if we concede you wrong, even if we applied a no substantial likelihood test here, that what Judge Simandl was recognizing is you allow Mr. Harris, by his absolute intransigence, to define no substantial likelihood. Isn't that the import of a recognition of that test? Well, courts deal with difficult tests all the time. Yes, but we don't traditionally, for obvious reasons, allow parties by their refusal to adhere to lawful orders of court to define what they will do lawfully, totally in derogation of those orders. It would completely undermine our system of justice, would we permit that? Absolutely. And that's why, unfortunately, what the district court should have to do is make this factual determination. It is not one that Judge Simandl ever made. And given the basis of his decision, he certainly didn't have to make it. But it is one that I believe in certain rare circumstances, such as this one, that a district court should have to make. We'll get you back on rebuttal, Mr. Borden. You've gone way over with our permission and our blessings. Thank you for this opportunity. Mr. Gross. Mr. Gross. Good morning, Robert. I'm Roman Gross, and I represent the United States in this case. Judge Smith, your parting words to Mr. Borden were anticipated almost 100 years ago by the United States Supreme Court in a case called Gompers v. Buckstone, in which the court said, if a party can make himself a judge of orders that have been issued and by his own act of disobedience set them aside, then the court is made impotent. And what the Constitution fittingly calls the judicial power of the United States is a mere mockery. Well, but doesn't Mr. Borden make a point that were we to apply the no substantial likelihood test, that there may not have been sufficient factual determinations here made by the district court in support of invoking that test or applying that test? Is that so? Your Honor, I think that's right. I don't think Judge D'Amato decided, had to decide, whether or not there was a substantial likelihood of compliance at all. And I'd like to make an argument that, in fact, there is a possibility of compliance here. But what I think the court should do in this case is not, for the first time, announce a rule that when it becomes likely by some... I'm sorry. I'm confused. You inserted a negative there. And are you saying what we should do is adopt a test? The test that I understand Mr. Borden is asking for is that a test that Judge Sotomayor discussed in the Armstrong opinion is rejected by the majority. The presumptive. When it becomes unlikely that the defendant is going to comply, he has to be released from civil contempt. And that is precisely the test that Judge Alito said does not currently exist under the federal constitution. And I think by your questions, you pointed out that there's very good reasons why it should not exist. Didn't Judge Alito, now Justice Alito, say in Chadwick that it is not an issue that has been decided by the Supreme Court, but the Third Circuit has decided it in Braun? Your Honor, respectfully, the Third Circuit did not decide it in Braun. Braun was a case in which the defendant refused to testify in front of the grand jury. He was offered immunity. He refused to testify. He was held in contempt. After three months, he asked the district court judge to have him contemplated because he said, as you can see from my complaints over the last three months, I'm never going to comply. The district court judge refused. The case came up to this court. This court said that in that situation, with a recalcitrant witness, you have a statute that says that a witness can be held for no more than 18 months. And the defendant has only been in court for some substantial period. Less than that, we're not going to assume, given Congress's determination that 18 months is an appropriate period of time to hold a witness in contempt. We're not going to say that this is a violation of due process. Now, Braun also. So should we just set aside the grand jury cases, the recalcitrant witness cases, and say they're inappropriate? You should distinguish them, Your Honor, for this reason. Congress set an 18-month limit on contempt confinement for recalcitrant witnesses because it recognized that even though witnesses should be encouraged to testify when they're ordered to, there are some socially appropriate reasons why a witness might not testify before talking about them. And I believe the other case we're going to discuss is the Armstrong opinion on the Second Circuit. And those are, for instance, you see these kind of cases pop up in the news frequently. A journalist who refuses to testify because she feels that it's a violation of her ethical obligations to maintain confidences. You may have a person who refuses to testify against a family member. You may have some professional person who's not covered by a statutory privilege who feels that they shouldn't testify because it would be a violation of their professional ethical obligations. But you certainly don't have that here. There may be some good motives for someone not to testify in a legal proceeding, but there are no good, decent motives for someone to do what Mr. Harris is doing in this case. Well, criminal proceedings come to an end, too. You do not need the witness any longer. But, Your Honor, Judge Simandl still has jurisdiction over this case. And, in fact, as he pointed out to us yesterday when he responded to our inquiry about what Mr. Harris has been up to in the last year, he reminded us that there is currently a hideous corpus proceeding brought by Mr. Harris. You missed my point. I think I wasn't clear. In the recalcitrant witness cases, when the criminal proceeding is ended, there is no need for the witness any longer. And, in fact, Your Honor, the key distinction there is that once the grand jury comes to an end or the trial is over, it's impossible now for the witness to comply. So those are the cases that Judge Simandl... That's where we get back into the inability to comply, which we don't have here. Absolutely not, Your Honor. Mr. Borden, frankly, apparently said at the beginning of our hearing, back in February of last year, that there was no impediment to Mr. Harris' compliance. Judge Simandl has had the patience of Joe in this case. He really has. He's a very patient judge. Mr. Borden and I have both... Tell me, this is not just for my amusement. What specifically has he done to Judge Simandl? Your Honor... And then you tell us what he's done to the rest of us. The MO of these people, who are part of this redemption ideology, in which they believe that the government is holding accounts of many things across their hands, what they did in this case is that they would send invoices to judicial officials, not just Judge Simandl, but the grand jury judge in this case, Judge Orlowski, and Judge Wolfson, who had a civil case that was related to this, saying, you owe me X millions of dollars for use of my name. My name is a copyrighted property, and you owe me a million dollars each time you use it. So the fact that you use my name repeatedly in an opinion has been an issue. I've counted up all the uses of my name, and I'm multiplying that by a million, and you owe me X millions of dollars. If the judge or the prosecutor doesn't respond to what's obviously a meritorious claim or a debt, then Mr. Harris and his cohorts would create what they called an additional liability, and create some bogus document. Is this what happened with Judge Simandl? Judge Simandl has been the object of numerous invoices from the defense. Just for clarification, did Judge Simandl not set to the side consummationist conduct of this kind directed at him, so that it was not part of the adjudication of contempt? The adjudication was based upon the conduct that was visited on others, not as to him. Yes, there were four documents. Speaking of his patients. There was no suggestion he should have recused himself. Your Honor, the defendants raised numerous recused motions. At one point, the defendants were trying to proceed per se. They got ready hearing from Judge Simandl. This was in the criminal case, though. That's right. In terms of the civil contempt. The civil contempt arose in the middle of the criminal case. Judge Simandl denied the motions for recusal. I don't recall. There were numerous issues raised on appeal. I don't remember whether Judge Simandl's denial of recusal was one of them. Well, the conviction was affirmed. Why shouldn't you go through the paces here? Why shouldn't you pursue criminal contempt or indict him? Because you can. You have a statute that would cover it. Your Honor, assume a situation where the defendant stands up in the middle of a trial and starts threatening the judge. I'm going to throw this water pitcher at you. I'm going to kill you. I'm going to do whatever. And the judge says, sit down, shut up, and don't open your mouth. And the defendant persists in this hell of a contempt. Now, in that case, and the judge says, and you're not to do that for the duration of this trial. And you're going to serve a sentence. Now, do you promise me that you're going to stop? There's all sorts of other remedies that are available at that point. That defendant can be prosecuted for terroristic threats or perhaps simple assault. But the defendant doesn't get to take away the judge's contempt power simply because there are other possibilities. No one's suggesting the power is lacking. Perhaps, though, after a certain point in time, there should be one of the other remedies should be utilized. Your Honor, what I think is appropriate is what I'm asking the court not to accept is a constitutional due process limit on the length of time that a judge can keep a contempt sanction in place. Limit? Do you concede that there are due process implications, which at some point in time, perhaps not this case, and I'm sure that's your argument, are very strongly implicated? Your Honor, certainly due process is implicated when there are issues about the defendant's ability to comply. But this is a case where the courts have said, when you look at the difference between civil and criminal contempt, you look at what the purpose is. I understand, but the purpose is my question because you were suggesting that you would not want this court to adopt some kind of limit based on due process purposes. A time limit. A time limit. And that, to me, is not the same thing as suggesting that there are no due process implications over an entire continuum, however long it may be. That may be a question for another day, but I'm trying to get to the heart of what I understand you're saying. I think due process certainly, Your Honor, weighs in as to whether or not there's a contempt order. The purpose of the contempt order from the perspective of the judge is to punish or to compel compliance. And if the judge has left in place a contempt order, which may have started out as a coercive contempt order, but leaves it in because the judge's purpose is now to punish the defendant without affording the due process. That's morphic. That's not a due process problem. Yes, I certainly agree with that. Even though there is an ability to comply. That's right, because I can imagine a situation, Your Honor, where the judge, I think, and I'm sure Judge Savino would, when he looks at Mr. Harris and tries to decide what to do with this man, who refers to him as Mr. Simandl and is unfailingly contemptuous every time he enters his courtroom. Judge Simandl, and Judge Simandl literally didn't think, but he said in February of last year, I'm inviting you, Mr. Harris, to take a walk with him. Now, there are a number of things that Judge Simandl is looking at here. He's looking at what is the nature of the harm that he's trying to alleviate, how serious is that harm, what damage has it caused, how long has it gone on. Perhaps he's looking at the reasons why Mr. Harris persists in his contempt. Now, if Mr. Harris came to Judge Simandl and said, you know, I belong to a religion which absolutely, you know, one of the central tenets is we don't accept the authority of judges because we think that the Constitution shouldn't have judges. You know, that would be something I think that Judge Simandl would earnestly take into consideration in deciding whether or not to live with him. But I think on this record, this court should affirm, Mr. Harris will not only have the opportunity, as you pointed out, to end this tomorrow, or today for that matter, but he will also have the opportunity to return to Judge Simandl and say, Judge Simandl, even though I'm not complying with your order, I'm asking you again to lift the contempt sanction for this, that, and the other reasons. Does Judge Simandl have an obligation to pull him in periodically for a hearing where there is an ability to comply, but he's refusing to comply? I know in the ability to comply cases you really do have to keep alert so that, as it's said, if there's an inability to comply for one day, he's out. Yes. Under these circumstances, do you believe it is appropriate or necessary for Judge Simandl to have him come in for another discussion? Well, Your Honor, given the fact that the contemptuous conduct is ongoing and unremitting, I'm not sure what point would be served for having a status conference every six months and having Judge Simandl ask Mr. Harris to continue communicating with me about this when I order him. But perhaps in another situation where a defendant simply stopped doing anything for some protracted period of time, it would be appropriate. The panel that affirmed his conviction was comprised of Barry, Jordan, and Hardin. Has anything been filed against the three of us? Not as far as I know, Your Honor. What's he done lately? I mean, what has he done recently? He has submitted, and Your Honor, Judge Simandl responded in writing to the letter that Mr. Gordon and I sent him on Wednesday describing the communications that have been sent to him since last February when the case was last affirmed, Judge Simandl, and attaching the documents that Mr. Harris has communicated to the court. Would you be happy to file those with the courts? I don't know that we need them. I think you both concede that he, or agree that he continues to file, which is really all we need. I just had a little enlightened self-interest there for a moment, and I got carried away. I'm certainly not in a position to make any guarantees, unfortunately, and myself as well. I've received some communications from Mr. Harris after we've been involved in this case. Has the government considered indicting him for criminal contempt? Not at this point, Your Honor, and I'll tell you why. Mr. Harris was sentenced to 188 months' incarceration as a result of his crimes in this case. He's a fairly—I think he's in his early 60s. I'm sure that if we indict him, we'd have another lengthy jury trial. We'd have a lengthy pre-trial proceedings. And just being at this point, Mr. Harris was sort of daring us to indict him and give him another platform, I think as one of the judges mentioned, to spout his ideology. So at this point, we're not inclined to. Right now he's serving his sentence for civil contempt, and he's not getting any credit on his 188-month sentence. That's right, Judge. The civil contempt would have no effect unless Judge Simandl had suspended the service of the criminal sentence. If you were allowed to serve the sentence correctly, the criminal sentence would have no effect. Any other questions? No. Thank you, Mr. Gross. Quick rebuttal, Mr. Gordon. Yes, Your Honor. In terms of what was before the court back in February 2008, I think it's important to point out that the only evidence in that record of continuing contemnationist conduct were communications with Judge Simandl. Well, you're not arguing that the civil contempt order was not supported by sufficient evidence, are you? No. Your Honor raised the question of what was in the record. I believe Judge Smith noted that Judge Simandl specifically took communications with himself out of it. I'm not. But all I am saying is that that fact, I think, demonstrates that as of now, or even after February 2008, the only thing that the civil contempt order is doing, the civil contempt sanction is doing, is vindicating the authority of the court. It is no longer even potentially promoting the appropriate handling of the case. It's no longer protecting third parties. In fact, by Judge Simandl's order, entirely appropriate order, these materials are not even being filed on the docket. As the court is aware, the federal prisons have restrictions so that things like this can't be mailed, for instance, to county courthouses. So that the only thing that the defendant continues to do that is in violation is to communicate with Judge Simandl in a way that is clearly in violation of the order, but that's the only thing he is doing. So that when the cases talk about the coercive effect versus the question of whether what's happening is simply vindicating the authority of the court, we are now in the situation where that is all the contempt citation is doing. Thank you very much. The case was extremely well argued. We will take it under advisement.